UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


NORTH AMERICAN PRECAST, INC. and
G&G BUILDERS, INC.

     Plaintiffs


v.                         CIVIL ACTION NO. 3:04-1307


GENERAL CASUALTY COMPANY OF WISCONSIN,
a Wisconsin corporation

     Defendant


<u>MEMORANDUM OPINION AND ORDER</u>


       Pending are cross-motions by plaintiffs and by defendant for summary judgment, both filed September 23, 2005.


I.


       The parties filed, on September 23, 2005, a stipulation of facts.  According to that document, they agree as follows.

       Plaintiff G&G Builders, Inc. ("G&G"), a West Virginia corporation, entered into a contract with plaintiff North American Precast, Inc. ("North American"), an Ohio entity, under

which North American would design, manufacture and supply "precast, pre-stressed, hollow core concrete panels or 'planks' in the construction of" the Western Regional Jail in Cabell County, West Virginia.  (Stip. ¶¶ 1,2,7,8).  G&G was to act as general trades contractor in building the jail pursuant to its successful bid for the public works project.  (Id. ¶ 6).  The original contract amount neared $13 million.  (Id.).  In exchange for providing the planks, North American was to be paid $660,600.  (Id. ¶ 8).  North American had no responsibility with regard to the installation of the panels.  (Id. ¶ 11).

        Under its contract with G&G, North American agreed to provide comprehensive insurance coverage and to name G&G as an additional insured under its policy, which it did.  (Id. ¶ 9).  A certificate of coverage was issued by defendant General Casualty Company of Wisconsin ("General Casualty"), a Wisconsin corporation, through its agent, and that certificate named G&G as an additional insured.  (Id.).

        On July 1, 2002, a portion of an installed plank at the work site collapsed and fell to the ground.  (Id. ¶ 13).  The parties represent that the collapse was the result of an

2

"incident," but they are not more specific.[1]  (Id.).

According to the testimony of G&G representative, Gary Young, the collapse of the panel caused damage to the immediate structure of the jail consisting of an exterior masonry wall and concrete floor.  (Young Depo. at 80-81, attached as Ex. A to Pls. Resp. to Surreply).  Jesse Childers, Jr. testified that it looked to him as if the plank had swung into the interior masonry wall. (Childers Depo. at 22-23, attached as Ex. A to Pls.' Resp. to Surreply).  The president of North American at the time of the collapse of the plank, Frank Brady, testified that he did not recall being told about the damage to the masonry wall, (Frank Brady Depo. at 21-23, attached as Ex. B to Surreply). Brady stated that he would have expected to hear that information from his employee, Illario Simonetta.  (Id. at 24).  In his deposition, however, Simonetta testified that the plank came crashing down on the concrete floor, the masonry exterior wall, and the masonry interior wall.  (Simonetta Depo. at 12-14, attached as Ex. A to Pls.' Resp. to Surreply).

---

[1]  Plaintiffs' memorandum describes the incident as "a twelve foot long, four foot wide monolithic concrete panel broke apart and fell to the floor below."  (Pls.' Memo. in Supp. of M.S.J. at 6).

3

In any event, the State, as project owner, issued a stop-work order on July 10, 2002, and, together with G&G and North American, began an investigation.  (Stip. ¶¶ 14-15).  The stop-work order was lifted on December 4, 2002.  (Id. ¶ 20; Beers Rpt. at 8, attached as Ex. F to Stip.).

According to Young, the status of the project on July 1, 2002, was

> on schedule the best I can recall.  We had all but, I believe two cell pods -- the roof on two cell 8 pods erected.  The precast -- and here, again, I will go from best guess -- 80 percent completed.  That area of the building was completed, and mechanical and electrical was going in.
>
> The roofing was installed on a good majority of the building where it was later discovered that there were questions about the precast in some of those areas, too, resulting in removal.

(Young Depo. at 35, attached as Ex. to Defs.' Resp. to M.S.J.).

G&G submitted "Invoice #1" in the amount of $561,798.16 to Rick Rickelman, then president of North American, and to Dan Sutherin, an agent of General Casualty, on January 22, 2003. (Stip. ¶ 16; Invoice #1, attached as Ex. B. to Stip.).  In submitting this first invoice, G&G provided a list of the damages it claims to have sustained, but indicated that "future invoices [would] follow relative to additional costs yet to be determined

4

and other potential costs. . ."[2]  (Invoice #1, attached as Ex. B.
to Stip.).  Sutherin notified General Casualty of the claim on
the following day, January 23, 2003, noting that the occurrence
date was July 1, 2002.  (Stip. ¶ 17).  A second invoice followed
on March 7, 2003, in the amount of $971,262.14.  (Invoice #2,
attached as Ex. D. to Stip.).[3]

North American filed a lawsuit against G&G in Ohio

---

[2] G&G said it incurred additional costs in these areas:
remediation and testing, general conditions, "potential"
liquidated damages, subcontract claims, other prime contractor
claims, administrative, legal, bond and insurance, lost profits,
lost interest, and interest expense.  (Invoice #1, attached as
Ex. B. to Stip.).  Both invoices attached to the stipulation show
a breakdown of expenses by months, but do not indicate which
expenses G&G claims to have incurred in each area.

[3] Defendant additionally asserts no coverage obligation
arises inasmuch as plaintiffs putatively failed to provide
seasonable notice of the claims.  According to the policy,
plaintiffs were obliged to apprise defendant, "as soon as
practicable[,]" of the events giving rise to the coverage
obligation.  The Supreme Court of Appeals of West Virginia has
observed that phrases describing the time within which notice
must be given reduce, regardless of their unique verbiage, to
whether the insured provided reasonable notice.  State Auto. Mut.
Ins. Co. v. Youler, 183 W. Va. 556, 561, 396 S.E.2d 737, 742
(1990).  As one might expect, the question of reasonable notice
is reserved to the fact finder, at least where the insured offers
some explanation for the length of delay.  See Youler, 183 W. Va.
at 561, 396 S.E.2d at 742; Dairyland Ins. Co. v. Voshel, 189 W.
Va. 121, 124, 428 S.E.2d 542, 545 (1993); Colonial Ins. Co. v.
Barrett, 208 W. Va. 706, 712, 542 S.E.2d 869, 875 (2000).  The
fact finder's multi-faceted inquiry is focused on (1) prejudice
to the investigative interests of the insurer, (2) the reasons
for delay, and (3) the length of delay.  See syl. pt. 2, in part,
Youler, 183 W. Va. at 556, 396 S.E.2d at 737.

state court on January 27, 2003, alleging breach of contract for failure to pay the amount due on the purchase order for the panels, and G&G counterclaimed based on theories of breach of contract, breach of implied warranties, and negligent performance. (Stip. ¶¶ 21, 22). The case was removed to the United States District Court for the Northern District of Ohio. (Id. ¶ 21). General Casualty denied coverage and declined to provide a defense in the action. (Id. ¶¶ 23-24). In the course of that lawsuit, "G&G and [North American] conducted extensive discovery and litigated the . . . issues vigorously for almost two years." (Id. ¶ 25). At some point, G&G submitted its offer to settle within policy limits to North American, which in turn requested that General Casualty accept the offer. (Id. ¶ 26). General Casualty declined, and North American agreed to confess judgment in the Ohio action and assign to G&G its rights under the insurance policy. (Id. ¶¶ 28-29). The Northern District of Ohio entered an agreed judgment order in favor of G&G and against North American in the amount of $1.8 million. (Id. ¶ 30).

Plaintiffs filed this action in this court on December 16, 2004, seeking declaratory judgment that their claims are covered under the policy of insurance (Count I), and further alleging causes of action for breach of contract (Count II), and

bad faith and unfair claim practices (Count III).  Counts I and II appear to be one and the same.  By order dated August 19, 2005, the court instructed the parties to confine briefing on the motions for summary judgment to the question of coverage.

II.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  <u>Id.</u>  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant

7

must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts

8

. . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).


                              III.


        Plaintiffs suggest that the court must determine whether West Virginia or Ohio has the most significant relationship to the dispute and apply the law of that state, which they propose is West Virginia, because there is no choice of law provision in the contract.  Defendant, on the other hand, contends that because it is determining coverage issues, the court should look to the law of the state in which the parties contracted for insurance.  The place of contracting appears to be Ohio, where the policy was sold.

        The parties agree that choice of law issues must be resolved by application of the law of the state in which the court sits.  <u>Klaxon Company v. Stentor Electric Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  The Supreme Court Appeals of West Virginia has held:

                In a case involving the interpretation of an
                insurance policy, made in one state to be
                performed in another, the law of the state of
                the formation of the contract shall govern,

                              9

> unless another state has a more significant
> relationship to the transaction and the
> parties, or the law of the other state is
> contrary to the public policy of this state.

Syl. pt., <u>Liberty Mutual Insurance Company v. Triangle Industries, Inc.</u>, 182 W. Va. 580, 390 S.E.2d 562 (1990).  The formation of the contract appearing to have taken place in Ohio, the law of Ohio governs, unless West Virginia is shown to have a more significant relationship to the events and the parties.

In <u>Triangle Industries</u>, the court noted its consideration of the Restatement (Second) of Conflict of Laws to determine which state has the most significant relationship. <u>Triangle Industries</u>, 182 W. Va. at 585, 390 S.E.2d at 567. Within two years, however, the court decided <u>Joy Technologies, Inc. v. Liberty Mutual Insurance Company</u>, 187 W. Va. 742, 421 S.E.2d 493 (1992), and though it relied on the holding of <u>Triangle Industries</u>, the court appears to have abandoned the formal Restatement analysis.  The court instead began its survey by noting simply that "the injury occurred in West Virginia, the instrumentality of the injury was located in West Virginia, and the forum selected to try the issues was West Virginia." <u>Joy Technologies</u>, 187 W. Va. at 746, 421 S.E.2d at 497.  The court continued, "These factors suggest that West Virginia has had a very significant relationship to the transaction and the parties.

10

In fact, the relationship would appear to be more substantial than that of [the state] where the contract was formed."[4]   Id.

Under the guidance provided by Joy Technologies, it appears that West Virginia's relationship to this controversy is more substantial than that of Ohio.  The General Casualty policy was issued to defendant North American, located in Stow, Ohio, through General Casualty's agent located in Solon, Ohio.  (Stip. ¶ 1).  The connection with Ohio ends there.[5]  The additional certificate of coverage was issued to G&G, a West Virginia corporation, specifically for the jail project, which the parties at all times knew would be located in West Virginia.  The insured risk was found in West Virginia, and there is no dispute that the

---

[4]    While the court observed that these factors alone could justify application of West Virginia law, it found further support for its decision after determining that application of the law of Pennsylvania, where the contract had been formed, would result in a violation of the public policy of West Virginia.  Joy Technologies, 187 W. Va. at 746, 421 S.E.2d at 497.

[5]    Defendant produces a memorandum written on July 26, 2004, by Michael Fortney, counsel for plaintiff North American, to Thomas Rosenberg, counsel for General Casualty, in which plaintiff's position on the coverage issue is summarized. Defendant argues that in the memorandum North American "relies exclusively upon Ohio law in interpreting [t]he [p]olicy" (Def.'s Memo. in Supp. of M.S.J. at 7) and that this reliance shows that North American "has consented to Ohio's jurisdiction . . ."  The position of plaintiff's counsel prior to the institution of this litigation has no bearing, however, on which state has the most significant relationship to the controversy.

11

injury occurred in this state as well.  For these reasons, the law of West Virginia should be applied in determining the coverage issue.

IV.

A.  Property Damage Caused by an Occurrence

The commercial general liability ("CGL") insurance policy at issue provides as follows for property damage liability under section 1, coverage A, subsection 1.b.:

>    This insurance applies to "bodily injury" and "property damage" only if:
>
>        (1) The "bodily injury: or "property damage" is caused by an occurrence that takes place in the "coverage territory";

(Policy) (emphasis added).  Section V sets forth policy definitions that includes: "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Id.  (emphasis added).

An accident is defined as "'an event occurring by chance or arising from unknown causes' . . . [and] 'generally means an unusual, unexpected and unforeseen event. . . . An accident is never present when a deliberate act is performed

12

unless some additional unexpected, independent and unforeseen happening occurs which produces the damage. . . . To be an accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual.'"  State Bancorp v. U.S. Fidelity and Guar. Ins. Co., 199 W. Va. 99, 105, 483 S.E.2d 228, 234 (1997) (per curiam) (internal quotations omitted).

The fundamental threshold issue is thus whether an accident has taken place such that an occurrence has been demonstrated under the policy.  See Webster County Solid Waste Authority v. Brackenrich & Associates, Inc., 217 W.Va. 304, 310, 617 S.E.2d 851, 857 (2005).  "Absent an occurrence, as that term is defined under the policy, there can be no coverage under the policy at issue, or any other commercial general liability policy."  Id. (analyzing substantially the same or similar policy language).

The Supreme Court of Appeals of West Virginia has made it clear that "'[c]ommercial general liability policies are not designed to cover poor workmanship.  Poor workmanship, standing alone, cannot constitute an "occurrence" [footnote omitted] under the standard policy definition of this term as an "accident . . . ."'"  Syl. pt. 2, Brackenrich, 217 W. Va. 304, 617 S.E.2d 851, (2005) (quoting syl. pt. 2, Corder v. William W. Smith Excavating

Co., 210 W. Va. 110, 556 S.E.2d 77 (2001)); accord Erie Ins.
Property and Cas. Co. v. Pioneer Home Improvement, Inc., 206 W.
Va. 506, 511-512, 526 S.E.2d 28, 33-34 (1999).

        In Pioneer, homeowners sued a contractor alleging
breach of contract for his poor workmanship.  Pioneer, 206 W. Va.
at 508, 526 S.E.2d at 30.  The contractor's insurance company
initially defended under a reservation of rights before it filed
the declaratory judgment.  Id. at 507, 29.  The damages at issue
under the policy were limited to those costs arising out of the
repair and replacement of the defective workmanship.  Id.  The
court explained that "CGL policies of insurance do not provide
protection for poor workmanship; instead, these policies protect
an insured from liability due to personal injury or property
damage to others caused by the insured's negligence."  Id. at
511, 33.  The Supreme Court of Appeals then held that "damages to
a building sustained by an owner as a result of a breach of a
construction contract due to a contractor's faulty workmanship
are a business risk to be borne by the contractor and not by his
commercial general liability insurer."  Id. at 512, 34.

        Pioneer illuminated this proposition with the following
quotation.

14

We quote with favor from <u>Weedo v. Stone-E-Brick, Inc.</u>, 81 N.J. 233, 249, 405 A.2d 788, 796 (1979), wherein the Supreme Court of New Jersey stated, "As we have endeavored to make clear, the policy in question does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident." (Citations omitted). The following illustration was offered in <u>Weedo</u> to mark the distinction between "business risks" and "occurrences" which give rise to insurable liability:

> When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the <u>homeowner or his neighbor standing below or to a passing automobile</u>, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. The <u>happenstance</u> and extent of the latter liability is <u>entirely unpredictable</u> -- the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. Whether the liability of the businessman is predicated upon warranty theory or, preferably and more accurately, upon <u>tort concepts</u>, injury to persons and damage to other property constitute the risks intended to be covered under the CGL.

<u>Id.</u>, 81 N.J. at 240-41, 405 A.2d at 791-92.

We summarize by stating that CGL policies of insurance do not provide protection for poor workmanship; instead, these policies protect an insured from liability due to personal injury or property damage <u>to others</u> caused by the insured's negligence. The circuit court correctly determined that Erie had no duty to indemnify Pioneer for the faulty installation

of siding and other work performed on the Skanes'
residence.

Pioneer Home Improvement, 206 W. Va. at 511-512, 526 S.E.2d at
33-34 (emphasis added).

The proper role of a CGL policy, according to West
Virginia law, is "not [to] insure the work or workmanship which
the contractor or builder performs.  They are not performance
bonds or builders' risk policies."  Id. at 511, 33.

In Corder, the plaintiff sought loss-of-use damages
based on an alleged occurrence stemming from a sewer pipe
failure.  Corder, 210 W. Va. at 116, 556 S.E.2d at 83.  The
Supreme Court of Appeals noted these damages were distinct from
the request in Pioneer for the replacement and repair of the
defective workmanship on the home.  Id.  Though Corder found a
remand necessary because the record was deficient as to the cause
of the sewer pipe's failure, it nevertheless "agree[d] with the
lower court's conclusion [in citing to Pioneer for the
proposition] that commercial general liability policies are not
designed to cover poor workmanship."  Id.

In Brackenrich, the county solid waste authority sued
the contractor and engineering firm for the faulty design,
engineering, and inspection of a landfill.  Brackenrich, 217 W.

Va. at 307, 617 S.E.2d at 854.  All of the claims alleged were
based upon faulty workmanship.  Id. at 309, 856.  The Supreme
Court of Appeals found that none of the three -- the defective
design, engineering, or inspection of the landfill -- constituted
an occurrence within the meaning of the policy.  Id. at 311, 858.
Syllabus point 3 of Brackenrich provides:

> Rather than providing coverage for a product or work
> performance that fails to meet contractual
> requirements, the commercial general liability policy
> is specifically designed to insure against the risk of
> tort liability for physical injury sustained by third
> parties as a result of the product or work performed or
> damages sustained by others from the completed product
> or finished work.  Because faulty workmanship claims
> are essentially contractual in nature, they are outside
> the risks assumed by a traditional commercial general
> liability policy.

Id.

_____The collapse of the panel, though caused by North
American's poor workmanship, may be considered an accident and
thus possibly an occurrence under the policy to the limited
extent that the panel is found to have damaged the floor and one
or two of the walls of the jail structure under construction that
was owned by the State but which G&G was doubtless bound under
its contract with the State to repair.  The collapse of the panel
has not been shown to have inflicted any other damage.

17

It is noted that plaintiffs initially sought the following relief in their complaint:

    a.   Damage to G&G's product;

    b.   Substantial adverse impacts to G&G's planned manner and method of performance, including delays and inefficiencies resulting from loss of use and access to the structure;

    c.   Substantial unanticipated costs for inspection, repair, plank replacement, testing of the completed roof structure and remediation resulting from the collapse of the failed plank;

    d.   Unanticipated additional costs made necessary by G&G's changed manner and method of performance;

    e.   Additional incidental and consequential damages.

(Compl. ¶ 15).  Throughout the briefing the following types of damages are mentioned: (1) remanufacture and redelivery of planks; (2) damage to two masonry walls and concrete floor; (3) loss of use; (4) reassembly of roof including installation of the replacement plank; and (5) testing of soundness of structure including floor.  (Pls.' Reply to Def. Resp. to M.S.J. at 2; Pls.' Memo. in Opp. to Mot. to File Surreply at 3).

The only damages potentially caused by the collapse of the panel were to one or two of the walls and the floor.  The factual dispute over the damage to the walls and floor precludes summary judgment for plaintiffs and the defendant.  (Young Depo. at 80-81, attached as Ex. A to Pls.' M.S.J.; Childers Depo. at

22-23, attached as Ex. A to Pls.' Resp. to Surreply; Simonetta

Depo. at 12-14, attached as Ex. A to Pls.' Resp. to Surreply;

Brady Depo. at 21, attached as Ex. B to Def.'s Surreply).

      In summary, it was not the plank collapsing, but rather

the faulty workmanship, which caused the remainder of plaintiffs'

damages.  As a consequence, the remainder of the damages are not

covered under the policy.  See syl. pt. 2, Brackenrich, 217 W.

Va. 304, 617 S.E.2d 851, (quoting syl. pt. 2, Corder, 210 W. Va.

at 116, 556 S.E.2d at 83); Pioneer, 206 W. Va. at 511-512, 526

S.E.2d at 33-34.  To hold otherwise would convert the CGL policy

into a performance bond -- which it plainly is not.  Pioneer, 206

W. Va. at 511, 526 S.E.2d at 33.

### B.  Policy Exclusions

      Defendant contends that policy exclusions 2m and 2n

prohibit recovery.  (Def.'s Memo. in Supp. of M.S.J. at 13-16).

      Exclusion 2m is set forth as follows:

      m.    Damage to Impaired Property or Property
             Not Physically Injured

             "Property damage" to "impaired
             property" or property that has not
             been physically injured, arising
             out of:

(1)  A defect, deficiency,
     inadequacy or dangerous
     condition in "your
     product"[6] or "your work";
     or

(2)  A delay or failure by you
     or anyone acting on your
     behalf to perform a
     contract or agreement in
     accordance with its
     terms.

This exclusion does not apply to the
loss of use of other property arising
out of sudden and accidental physical
injury to "your product" or "your work"
after it has been put to its intended
use.

(Policy) (emphasis added).  With respect to the exception to the

exclusion, the planks when installed had been put to their

intended use as a ceiling or floor in the jail structure.  The

loss of use of the jail structure does not arise out of the

sudden and accidental physical injury to the plank when it fell

to the ground; rather, the loss of use arises out of the

defective planks that had been furnished and installed and

remained a part of the jail structure.  As a consequence, the

exception is inapplicable.

---

     [6]  The policy defines "your product" to include "any goods
or products, other than real property, manufactured, sold, . . .
by: (1) You . . . ."  (Policy).  This would include North
American's planks.

In turning to the potential damages excluded under 2m, the court notes the policy defines "impaired property" as

> tangible property other than 'your product' or 'your work' that cannot be used or is less useful because:
>
>> a.    It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
>>
>> b.    You have failed to fulfill the terms of a contract or agreement;
>
> if such property could be restored to use by:
>
>> a.    The repair, replacement, adjustment or removal of "your product" or "your work"; or
>>
>> b.    Your fulfilling the terms of the contract or agreement.

(Policy Sec. V(8)) (emphasis added).  Neither the masonry walls nor the concrete floor can be impaired property inasmuch as they cannot be restored by repair, replacement, adjustment or removal of the planks or by the fulfilling of the contract.  The masonry walls and concrete floor are said to have been physically injured by the collapse of the plank.  As they are neither impaired property nor property not physically injured, exclusion 2m does not apply to the masonry walls or concrete floor.  The remainder of the damages sought by plaintiffs, however, are either impaired

property or property not physically injured and are indeed barred by exclusion 2m.

Defendant explains exclusion 2n applies to damages for "loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of NAP's product." (Def.'s Resp. to M.S.J. at 20). Exclusion 2n provides as follows:

> n. Recall of Products, Work or Impaired Property
>
> Damages claimed for any loss, costs or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> > (1) "Your Product";
> > (2) "Your Work"; or
> > (3) "Impaired property";
>
> If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Policy) (emphasis added).

Plaintiffs argue that this exclusion is inapplicable because it only addresses products withdrawn from "the market." (Pls.' Resp. to M.S.J. at 10). The plain language of this provision, however, does not limit the exclusion to traditional recalls from the stream of commerce. The language states that

22

the exclusion applies if the product is "<u>withdrawn or recalled</u> from the market <u>or from use by any person</u> . . . <u>because of a known or suspected defect</u> . . . ."  Here, the parties have agreed that the regional jail site project owner issued a stop-work order subsequent to the collapse of one of North American's planks.  (Stip. ¶ 14).  Plaintiffs further state that the panels were "rejected by the project engineer," (Pls.' Resp. to Def. M.S.J. at 10), a "person" within the meaning of the exclusion just quoted.  The stop-work order was a means of "withdraw[ing]" the panels "from use."  Investigation and testing was then initiated, indicating that a defect was suspected.  The exclusion thus applies to the damages sought for "loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of NAP's product."

The court declines plaintiffs' request to invoke the reasonable expectations doctrine in the interpretation of the policy, which plaintiffs seek particularly as to Exclusion 2m.  "Before the doctrine of reasonable expectations is applicable to an insurance contract, there must be an ambiguity regarding the terms of that contract."  <u>Robertson v. Fowler</u>, 197 W. Va. 116, 120, 475 S.E.2d 116, 120 (1996) (internal citation omitted).  Inasmuch as plaintiffs have not pointed to an ambiguity that

23

would merit invocation of the reasonable expectations doctrine, it has no application here.

V.

It is, accordingly, ORDERED as follows:

1.   Plaintiffs' motion for summary judgment be, and it hereby is, denied except that it is granted to the extent coverage exists for damage to the masonry walls and concrete floor, if any there be, caused by the collapse of the plank; and

2.   Defendant's motion for summary judgment be, and it hereby is, granted except that it is denied to the extent coverage exists for damage to the masonry walls and concrete floor, if any there be, caused by the collapse of the plank.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: March 31, 2008

John T. Copenhaver, Jr.
United States District Judge

24