UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

NORTH AMERICAN PRECAST, INC. and
G&G BUILDERS, INC.

   Plaintiffs

v.         CIVIL ACTION NO. 3:04-1307

GENERAL CASUALTY COMPANY OF WISCONSIN,
a Wisconsin corporation,

   Defendant

## MEMORANDUM OPINION AND ORDER

Pending are defendant's "MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR NEW TRIAL AND/OR REMITTITUR[, ('posttrial motion']" filed August 22, 2008, and "SUPPLEMENTAL MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR NEW TRIAL AND/OR REMITTITUR[, ('supplemental post-trial motion')]" filed September 2, 2008.

At the conclusion of Phase Two of this bifurcated action, the jury found that defendant breached its insurance contract, acted in bad faith, and violated West Virginia's Unfair Trade Practices Act.  The jury assessed damages for (1) increased costs of litigation in the amount of $1,712,644.29 and (2) aggravation, annoyance and inconvenience in the amount of $1,812,500.00, aggregating $3,525,144.29.  When added to the

Phase One jury-assessed damages of $94,474.71 for property damage covered by the insurance policy issued by the defendant, the total is $3,619,619.00.  Left for the court is the assessment of attorney fees and costs, including those constituting increased costs of litigation, and interest.

I.

Plaintiff G&G Builders, Inc. ("G&G"), a West Virginia corporation, contracted with fellow plaintiff North American Precast, Inc. ("North American"), an Ohio entity.  The parties agreed that North American would design, manufacture, and supply "precast, pre-stressed, hollow core concrete panels or 'planks' in the construction of" the Western Regional Jail in Cabell County.  (Stip. of Parties ¶¶ 1, 2, 7, 8 ("Stip.")).  G&G had previously been named the general trades contractor for the facility.  The contract provided that North American would be paid $660,600 for the planks, for which it bore no installation responsibilities.  (Id. ¶ 8, 11).

North American further agreed to provide comprehensive insurance coverage and to name G&G as an additional insured under its policy.  (Id. ¶ 9).  The policy issuer, defendant General

2

Casualty Company of Wisconsin ("General Casualty"), prepared and delivered through its agent a certificate of coverage naming G&G as an additional insured.  (Id.).  As will be seen, G&G makes no claim herein as an additional insured.

On July 1, 2002, a portion of an installed North American plank at the work site collapsed.  (Id. ¶ 13).  During his trial testimony, Gary Young, the president and sole owner of G & G Builders, described the incident as follows:

> On the Monday morning, I believe, which was July 1st, we received a phone call in our office from our superintendent, Greg Ashman, on site, that one of the precast panels had collapsed in the kitchen area which was building area E.  Of course, this caused unbelievable concern, and we rushed to the job site to observe what had occurred.  The situation was such that a plank roughly 38 to 40 feet long, weighing around 14,000 pounds or 7 ton, the entire bottom of that plank had collapsed, and as a result of all the tension -- and Rick [Rickelman of North American Precast] would know better than I just how many thousand pounds of tension are on those cables the plank literally exploded.  Pieces of it went into both the interior side of the south wall which was the outside, the inside of the south wall, as well as against the corridor wall on the opposite side.

(Tr. Trans. at 50-51 ("Trans.")).

The State of West Virginia, as project owner, issued a stop-work order on July 10, 2002.  It then commenced an investigation of the incident with G&G and North American. (Stip. ¶¶ 14-15).  On December 4, 2002, the stop-work order was lifted.  (Id. ¶ 20; Beers Rpt. at 8, attached as Ex. F to Stip.).

3

Following the plank collapse and investigation, G&G undertook extensive repairs with respect to that plank alone. The effort included (1) "shoring up" the remaining portion of the concrete plank for safety purposes, (2) crane removal of the remains of the collapsed plank, (3) the installation of a replacement plank, (4) replacement of the damaged masonry walls, and (5) the repair and resurfacing of the cement floor. (Trans. at 58, 60, 65-66). Of far greater concern and consequence was the integrity of the project as a whole. After an exceptionally labor-intensive and complex in situ load testing a portion of the roof, the State required replacement of several of the planks and the repair of several others in order to meet the prescribed specifications. (Sett. and Assign. of Claims, Ex. A, Pl's Tr. Br. ¶¶ 2-5). As a result, the project was substantially delayed at considerable cost to G&G. (Stip. ¶¶ 13-20).

On January 22, 2003, G&G submitted to Rickelman and Dan Sutherin, a General Casualty agent, an invoice in the amount of $561,798.16. (Stip. ¶ 16; Invoice #1, attached as Ex. B. to Stip.). The invoice listed damages G&G claimed to have sustained, indicating as well that "future invoices [would] follow relative to additional costs yet to be determined and other potential costs. . . ." (Invoice #1, attached as Ex. B. to

4

Stip.).  On March 7, 2003, a second invoice from G&G followed in

the amount of $971,262.14.  (Invoice #2, attached as Ex. D. to

Stip.).

On January 23, 2003, Sutherin faxed the first invoice

to General Casualty.  Sutherin's transmittal letter alerted

General Casualty that North American had asserted significant

defenses to the G&G claims:

> A.   North American . . . provided Plank for the Western
>      Regional Jail Project.
>
> B.   The general contractor has alleged defective product.
>
> C.   [North American] has passed all independent testing of
>      product successfully (4 or 5 tests) and in accordance
>      with the Precast Concrete Institute (PCI) standards and
>      in accordance with WVA NPCI specifications.
>
> D.   Plank provided . . . endured "Improper Saw Cut" by
>      another contractor and a plank subsequently failed.
>      While the other contractor claimed appropriate
>      technique, NAP advises it was not done according to PCI
>      standards.
>
> . . . .
>
> Rick Rickelman advises me that he does not see any
> wrongdoing from any of the testing or from NAP's role
> in this issue. The failure that occurred arose from
> improper cutting technique by another contractor not
> yet a party to this claim. We anticipate defense only
> on this claim.

(Pls.' Ex. 5 (emphasis supplied)).

The same day, a Sutherin representative, Cairl Dacar, also sent an email to General Casualty's adjuster, Debbie Keisler, stating as follows:

> Good morning! There is additional property damage caused by the collapse, however I don't have specific information regarding that. They are also claiming adverse impacts including 'project delays, repair/replacement of defective product, precautionary reinforcement measures, additional testing and inspection . . . .
>
> Hope this helps!

(Pls.' Ex. 7). The same day, Ms. Keisler acknowledged that General Casualty's policy would cover property damage by indicating in a Claims Setup Requisition form as follows: "Our policy would respond to resultant damage if a case of liability is established against the insd." (Pls.' Ex. 8).

General Casualty, however, denied coverage and declined to defend North American, (Stip. ¶¶ 23-24), as indicated in a July 8, 2003, coverage denial letter to North American's counsel Michael Fortney:

> This is a breach of contract claim. General Casualty does not provide coverage under these circumstances. The only allegation apparent is that the plank was defective in product manufacture. In the absence of resulting property damage or bodily injury, General Casualty does not have an obligation to defend or otherwise indemnify its insured for the claims made by G & G Builders against North American.

(Pls.' Ex. 23).

On January 27, 2003, North American instituted an action against G&G in Ohio state court alleging breach of contract for failure to pay the amount due on the purchase order for the panels. (Stip. ¶ 21). G&G contested jurisdiction, a matter resolved ten months later by order of the Ohio state court entered November 25, 2003. G&G then counterclaimed on December 22, 2003, alleging breach of contract, breach of implied warranties, and negligent performance. G&G removed the action on January 15, 2004, to the United States District Court for the Northern District of Ohio. (Stip. ¶¶ 21-22).

Faced with General Casualty's refusal to cover or indemnify, North American was forced to retain its own lawyer, pay litigation expenses, and superintend the litigation with the assistance of counsel. Rickelman explained the impact of those duties and costs:

> North American . . . was required to spend time, not only by myself, but the people that were employed by North American . . ., we spent a lot of time working on these issues. We spent a lot of money with attorney fees and preparing for this litigation. North American . . . is not accustomed to litigation. We are a company that sells precast concrete products, and this time spent kept us from selling or bidding . . . .
>
>       . . . .
>
> North American competitively bid 95 percent of its projects.

7

Q.   Mr. Rickelman, did the time required to be
involved in the management of the litigation with G&G
Builders impact in any way then the ability of North
American . . . to carry on its business operations?

A.   Yes.  The time that it took to discuss with Mr.
Fortney the case, the time that it took to -- for me to
understand the case fully, talking with people involved
at North American . . . , took time away from mainly
our bidding process.  Our bidding process again
requires us to bid lots of jobs.  Our win rate or
success rate was I feel a good success rate of 15-16
percent of the total number of jobs that we bid.  So
for every 100 jobs we bid, we might get 16 or 17 of
them.  With those averaging, you don't have a lot of
time to be spending on the litigation that we were
involved in.

         . . . .

North American . . . was required . . . to hire Mr. Fortney
to defend us.  We were interviewing expert witnesses to
testify on our behalf.  And, again, we -- I interviewed the
people that were involved directly with -- with G&G Builders
and the jail [project] from North American . . . .

(Trans. 668, 672).


        On cross examination, counsel examined Rickelman on how

things might have been different if General Casualty had

fulfilled its defense obligations:

Q.   Now, you also said that during that litigation,
     you had to spend time working on the issues in the
     litigation, to prepare for it and your people were
     involved in it.  Are you aware that under the
     policy of insurance issued by General Casualty to
     North American . .  that in the event of a
     lawsuit, that North American . . . has a duty to
     cooperate in that litigation?  Are you aware of
     that?

A.   Yes.

                    .  .  .  .

     Q.    So, therefore, the work you did, spending time
           working on that case with Mr. Fortney, a lot of
           that work you still would have had to do if
           General Casualty had provided a defense because
           you would have to do it with their lawyer,
           correct?

     A.    Not necessarily.

     Q.    Oh, so, in other words, you would have provided more
           information to Mr. Fortney than you would have provided
           to General Casualty's lawyer?  Is that what you are
           telling us?

     A.    No, sir.

     Q.    Okay.  What you told Mr. Fortney and the time you spent
           working on the case, you would have had to spend a
           considerable amount of that time with General Casualty,
           correct?

     A.    Could have been.

     Q.    Now, for example, you said you had to discuss the case
           with him, you had to understand the case.  You would
           have wanted to do that anyway, especially since a large
           amount of what you were being sued for wasn't covered,
           correct?

     A.    That's correct, but I wouldn't have had to pay Mr.
           Fortney to do it.

(Trans. 680-81).


          As the underlying litigation progressed, attorney

Fortney obtained discovery responses from G&G on or about July

26, 2004, apparently confirming that it sought recompense for

"resulting property damage."  (Pls.' Ex. 28).  Fortney notified

                                9

General Casualty that "G&G . . . alleges that the delamination of the plank caused other resulting physical injury to tangible property on the project." (Id.) On November 15, 2004, General Casualty refused to reconsider its position that neither a coverage nor a defense obligation attached. (Pls.' Ex. 34).

At some point, G&G offered to settle within policy limits, but General Casualty refused North American's request that the offer be accepted. (Stip. ¶ 26). North American responded by confessing judgment and assigning to G&G its rights under the General Casualty policy. (Id. ¶¶ 28-29). The United States District Court for the Northern District of Ohio entered an agreed judgment order in favor of G&G and against North American in the amount of $1,807,109 on October 12, 2004, nearly ten months after the counterclaim was filed by G&G. (Id. ¶ 30). Rickelman testified as follows:

> Q. Why did North American Precast enter into this settlement and assignment of claims document, exhibit 32?
>
> A. We could no longer afford to pay for the attorney fees and we basically surrendered our rights to G&G so it would stop the bleeding of the cash. Our cash flow was tight as it was and having to put out this money caused us to basically, again, surrender to G&G Builders.

(Tr. at 674). Mr. Rickelman further testified that the bank

10

would no longer allow North American to use its line of credit to
fund the G&G litigation.[1]

On December 16, 2004, G&G and North American instituted
this action seeking a declaratory judgment establishing coverage
under the General Casualty policy (Count I).  Plaintiffs further
alleged claims for breach of contract (Count II), and bad faith
and unfair claim practices (Count III).  On March 31, 2008, the
court concluded that a coverage obligation existed for damages
visited upon the masonry walls and concrete floor of the Western
Regional Jail as a result of the plank collapse.  North American
Precast, Inc. v. General Cas. Co. of Wisconsin, No. 3:04-1307
(S.D. W. Va. Mar. 31, 2008) ("Plaintiffs' motion for summary
judgment . . . is . . . denied except that it is granted to the
extent coverage exists for damage to the masonry walls and
concrete floor, if any there be, caused by the collapse of the
plank[.]").

_____

[1]Unmentioned is that North American was in a similar
defective plank suit with Wiseman Construction, Inc., involving a
juvenile detention center project where North American confessed
judgment in the amount of $539,241 on a $61,776 job, and the
Fortney attorney fees were in the range of $20,000.  (Trans. at
475-82).  In a companion action in this court, it was found that
the same policy of insurance at issue here provided no coverage
for any loss sustained there and no duty to defend.  See North
Am. Precast, Inc. v. General Casualty Company, No. 2:04-1306,
slip op. at 19-20 (S.D. W. Va. Mar. 31, 2008); North Am. Precast,
Inc. v. General Casualty Company, No. 2:04-1306, slip op. at 1-2
(S.D. W. Va. Aug. 13, 2008).

11

The plaintiffs agree that this action is maintained only as one by G&G as assignee of North American.  (Trans. 773-74). On August 13, 2008, a bifurcated jury trial commenced. Phase One concerned whether General Casualty received reasonable notice of G&G's claim and the damages, if any, sustained by the masonry walls and floor as a result of the plank collapse.  On August 15, 2008, the jury found that General Casualty received reasonable notice of the claim and that the sum of $94,474.71 represented just compensation for the cost of repairing the facility's masonry walls and concrete floor.  (Phase One Spec. Int. and Verd. Form at 1-2).  General Casualty does not challenge either of these findings.

Phase Two addressed plaintiffs' claims for breach of contract, bad faith and violations of the West Virginia Unfair Trade Practices Act.  On August 21, 2008, the jury found that General Casualty breached its insurance contract, acted in bad faith, and violated West Virginia's Unfair Trade Practices Act. (Phase Two Spec. Int. and Verd. Form at 1-2).  General Casualty does not challenge these findings.  Plaintiffs were additionally awarded, however, $1,712,644.29 for increased costs of litigation, excluding attorneys fees and costs, and $1,812,500.00 for aggravation, annoyance and inconvenience, for a total award on Phase Two of $3,525,144.29. (Id. at 2).

12

General Casualty now contends as to Phase Two that (1) the two components of the total award are against the manifest weight of the evidence, (2) corporate entities may not recover for aggravation, annoyance, and inconvenience, and (3) Ohio law applies to plaintiff's claims.  The second argument was not made at trial and was first raised on October 2, 2008, within General Casualty's "BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR NEW TRIAL AND/OR FOR REMITTITUR[.]"[2]  The

_____

[2]As noted, General Casualty had originally filed a posttrial motion on August 22, 2008.  On August 25, 2008, the court ordered General Casualty

> to file an amended motion for judgment as a matter of law, for new trial or remittitur, <u>setting forth with specificity each of the grounds upon</u> which it intends to rely, within the time allotted by the Federal Rules of Civil Procedure for the original motion . . . .

(emphasis supplied).  The supplemental posttrial motion filed on September 2, 2008, in compliance with the August 25, 2008, order states as follows: "Defendant now submits the following specific grounds for the relief it has requested. Defendant will set forth its arguments in greater detail when it submits its brief in support of its motion."  The supplemental motion's arguments are discretely enumerated as seeking

> relief on three (3) grounds.  First, the jury award for Plaintiff North American Precast, Inc.'s increased costs of litigation is against the manifest weight of the evidence presented at trial. . . . Second, the jury award of damages for Plaintiff's aggravation, annoyance, and/or inconvenience resulting from General Casualty's denial of coverage to North American Precast was likewise against the manifest weight of the evidence. . . . Finally, Defendant will respectfully
> (continued...)

13

court previously rejected the third argument, that Ohio law

governs, in its March 31, 2008, memorandum opinion and order.

North American Precast, Inc. v. General Cas. Co. of Wisconsin,

No. 3:04-1307, slip op. at 9-11 (S.D. W. Va. Mar. 31, 2008).

General Casualty has presented no argument meriting

reconsideration of that earlier decision.

II.

A.   The Governing Standards

          Federal Rules of Civil Procedure 50(b) and 59(a)

provide respectively as follows:

> [Rule 50(b)]  If the court does not grant a motion for
> judgment as a matter of law made under Rule 50(a), the
> court is considered to have submitted the action to the
> jury subject to the court's later deciding the legal
> questions raised by the motion. No later than 10 days
> after the entry of judgment -- or if the motion
> addresses a jury issue not decided by a verdict, no

---

[2](...continued)
renew and/or preserve its argument that Ohio law, not
West Virginia law applies to the duties and obligations
of General Casualty to its insured and as a result
therefrom, Defendant General Casualty is not subject to
the provisions of the West Virginia Unfair Trades [sic]
Practices Act.

(Supp. Posttr. Mot. at 2-3).  As noted, no mention was made of
the argument that a corporate entity cannot recover for
aggravation, annoyance and inconvenience until the defendant
filed its brief in support of the motion on October 2, 2008.

later than 10 days after the jury was discharged -- the
movant may file a renewed motion for judgment as a
matter of law and may include an alternative or joint
request for a new trial under Rule 59. In ruling on the
renewed motion, the court may:

> (1) allow judgment on the verdict, if the
> jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter
> of law.

[Rule 59(a)] The court may, on motion, grant a new
trial on all or some of the issues -- and to any party
-- . . . for any reason for which a new trial has
heretofore been granted in an action at law in federal
court . . . .

Fed. R. Civ. P. 50(b), 59(a).

        In response to longstanding concerns over the

respective authority of district and appellate courts in

addressing posttrial motions following a jury verdict, the

Supreme Court observed in 1996 as follows:

> [We have reaffirmed that] "[t]he trial judge in the
> federal system, . . . has . . . discretion to grant a
> new trial if the verdict appears to [the judge] to be
> against the weight of the evidence."  This discretion
> includes overturning verdicts for excessiveness and
> ordering a new trial without qualification, or
> conditioned on the verdict winner's refusal to agree to
> a reduction (remittitur).

Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433

(1996) (citations omitted); see also Sloane v. Equifax

Information Services, LLC, 510 F.3d 495, 502 (4th Cir. 2007)

(noting that "if a court concludes that a jury award of compensatory damages is excessive, it may order a new trial <u>nisi</u> remittitur."); <u>Konkel v. Bob Evans Farms Inc.</u>, 165 F.3d 275, 280 (4th Cir. 1999) ("If we find a jury's damage award excessive, we may 'grant a new trial <u>nisi</u> remittitur, which gives the plaintiff the option of accepting the remittitur or of submitting to a new trial.'") (citation omitted).

The applicable federal standard for a Rule 50(b) motion is summarized as follows:

> Under Fed.R.Civ.P. 50(b), the question is whether a jury, viewing the evidence in the light most favorable to Bryant, "could have properly reached the conclusion reached by this jury." If reasonable minds could differ about the result in this case, we must affirm the jury's verdict. . . .

<u>Bryant v. Aiken Regional Medical Centers Inc.</u>, 333 F.3d 536, 543 (4th Cir. 2003) (citations omitted); <u>International Ground Transp. v. Mayor And City Council Of Ocean City</u>, 475 F.3d 214, 218-19 (4th Cir. 2007)("When a jury verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party."); <u>Tools USA and Equipment Co. v. Champ Frame Straightening Equipment Inc.</u>, 87

16

F.3d 654, 656-57 (4th Cir. 1996) (citations omitted) ("Champ argues that the district judge erred in denying its motions for judgment as a matter of law with respect to both liability and damages.  A court may only grant a motion for judgment as a matter of law (formerly j.n.o.v.) if, viewing the evidence in the light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, the court "determine[s] that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party."); Hetzel v. County of Prince William, 89 F.3d 169, 171 (4th Cir. 1996).

        The standard governing a Rule 59(a) motion is more nuanced.  Following the decision in Gasperini, state law essentially supplies the means for review:

        The Supreme Court determined that because the Erie doctrine . . . "precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court," a district court sitting in diversity must apply state law standards when it considers a Rule 59(a) motion for a new trial based upon the alleged excessiveness of the jury's compensatory damage award.

        Gasperini overruled our circuit precedent that called for district courts sitting in diversity to apply federal law in determining the merits of a motion pursuant to Rule 59(a) for a new trial based upon the alleged excessiveness of the jury's verdict. Specifically, in our circuit prior to Gasperini, a district court was required to set aside a jury's

17

> verdict as excessive "even when such a verdict is
> supported by substantial evidence 'if [it] is of the
> opinion that the verdict is against the clear weight of
> the evidence, or is based upon evidence which is false,
> or will result in a miscarriage of justice.'"
>
>         Under the Supreme Court's mandate in Gasperini,
> the magistrate judge was required to apply Pennsylvania
> law in determining whether the jury's $1,000,000
> compensatory damage award in favor of Konkel was
> excessive.

Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 280-81 (4th Cir.

1999) (citations omitted); Stamathis v. Flying J, Inc., 389 F.3d

429, 438 (4th Cir. 2004)("Whether this verdict should be set

aside as excessive is a matter of Virginia law.") (citing

Gasperini, 518 U.S. at 438).


        The West Virginia standard governing the review of

verdicts for excessiveness is now reasonably well settled:

> "Courts must not set aside jury verdicts as
> excessive unless they are monstrous,
> enormous, at first blush beyond all measure,
> unreasonable, outrageous, and manifestly show
> jury passion, partiality, prejudice or
> corruption." Syl. Pt., Addair v. Majestic
> Petroleum Co., Inc., 160 W.Va. 105, 232
> S.E.2d 821 (1977) [hereinafter, "the Addair
> standard"].
>
> Syl. pt. 5, Roberts v. Stevens Clinic Hosp., Inc., 176
> W. Va. 492, 345 S.E.2d 791 (1986). We agree with Judge
> Hatcher's conclusion that the verdict was not excessive
> and, thus, Sopher was not entitled to remittitur or a
> new trial on damages.

Coleman v. Sopher, 201 W. Va. 588, 606, 499 S.E.2d 592, 610

(1997); Peters v. Rivers Edge Min., Inc., --- W. Va. ---, ---,

680 S.E.2d 791, 814 (2009); Adkins v. Foster, 187 W. Va. 730,

735, 421 S.E.2d 271, 276 (1992) (quoting <u>Addair v. Majestic</u>

<u>Petroleum Co., Inc.</u>, 160 W.Va. 105, 232 S.E.2d 821 (1977)).[3]

---

[3]The Supreme Court of Appeals of West Virginia has also observed pertinently as follows:

> "When a trial judge vacates a jury verdict and awards a new trial pursuant to Rule 59 of the West Virginia Rules of Civil Procedure, the trial judge has the authority to weigh the evidence and consider the credibility of the witnesses. If the trial judge finds the verdict <u>is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice</u>, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial. . . .

Syl. Pt. 1, <u>Ware v. Howell</u>, 217 W. Va. 25, 26, 614 S.E.2d 464, 465 (2005)(citation omitted) (emphasis supplied); <u>see also</u> <u>Alkire v. First Nat. Bank of Parsons</u>, 197 W. Va. 122, 127, 475 S.E.2d 122, 127 (1996) ("The motion for a remittitur is technically a motion to alter or amend judgment pursuant to W. Va. R. Civ. P. 59(e) . . . .").

While the <u>Addair</u> standard appears to control, the court's disposition would be the same under the foregoing, traditional tripartite Rule 59 standard set forth in <u>Ware</u> and generally applicable in this circuit.  <u>Compare</u> <u>First Union Commercial Corp. v. GATX Capital Corp.</u>, 411 F.3d 551, 556 (4th Cir. 2005) (stating that "[t]he court will uphold a damage award 'unless no substantial evidence is presented to support it, it is against the clear weight of the evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice.'") (citation omitted); <u>Hetzel v. County of Prince William</u>, 89 F.3d 169, 171 (4th Cir.  1996) (stating that "[a] jury's award of compensatory damages will be set aside on the grounds of excessiveness only if "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, . . . [or] no substantial evidence is presented to support it . . . .").

The determination of whether, and in what amount, a verdict for indeterminate damages should be remitted is necessarily subjective.  In <u>Roberts v. Stevens Clinic Hosp., Inc.</u>, 176 W. Va. 492, 345 S.E.2d 791 (1986), the Supreme Court of Appeals of West Virginia offered some insight into how it arrived at what it deemed to be a legally sustainable, remitted verdict:

> [W]e have decided to dispose of the one meritorious assignment of error, namely the excessiveness of the verdict, simply by asking ourselves: "What is the highest jury award under the facts of this case that would not be monstrous and enormous, at first blush beyond all measure, unreasonable and outrageous, and such as manifestly shows jury passion, partiality, prejudice, or corruption?" Our answer, after substantial collegial discussion, is $3,000,000 and that is the amount that we will allow to stand.

<u>Id.</u> at 501, 345 S.E.2d at 800-01.

From a procedural standpoint, and similar to the rule applicable in this circuit, a remitted verdict results in a choice for the plaintiff:

> Where liability is clearly established and the jury has made an erroneous over-calculation of damages, a remittitur may be directed on remand.  If the plaintiff declines to accept the remittitur, then a new trial will be ordered solely on the issue of damages.

Syl. Pt. 10, <u>Wilt v. Buracker</u>, 191 W. Va. 39, 42, 443 S.E.2d 196, 199 (1993).

Finally, the court of appeals and the supreme court of appeals are in further agreement that, "[u]nlike the procedure

20

under Rule 50(b), on a motion for a new trial under Rule 59(e) a district court is permitted to weigh the evidence." <u>Compare Dennis v. Columbia Colleton Med. Ctr., Inc.</u>, 290 F.3d 639, 650 (4th Cir 2002) (citing <u>Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.</u>, 41 F.3d 182, 186 (4th Cir. 1994) ("Given the district court's intimate familiarity with the trial, the district court 'may weigh evidence and assess credibility in ruling on a motion for a new trial.'")), <u>with</u> Syl. pt. 1, in part, <u>Neely v. Belk Inc.</u>, 222 W. Va. 560 562, 668 S.E.2d 189, 191 (2008) ("When a trial judge vacates a jury verdict and awards a new trial pursuant to Rule 59 of the West Virginia Rules of Civil Procedure, the trial judge has the authority to weigh the evidence and consider the credibility of the witnesses.") (internal quotation marks and citation omitted); Syl. Pt. 3, <u>in part</u>, <u>In re State Public Building Asbestos Litigation</u>, 193 W. Va. 119, 454 S.E.2d 413 (1994).


B.   The First Argument -- The Award is Against the Manifest
     Weight of the Evidence


As noted, plaintiffs were awarded in Phase Two $1,712,644.29 for increased costs of litigation, excluding attorneys fees and costs, and $1,812,500.00 for aggravation, annoyance and inconvenience, for a total of $3,525,144.29. Inasmuch as some evidence supports both damage elements, the

posttrial and supplemental posttrial motions appear best suited
for treatment under Rule 59 rather than Rule 50.[4]

Regarding the increased costs of litigation, the
evidence is sparse.  It is first noted that North American
engaged its attorney, Michael Fortney, to institute the Ohio
action filed January 27, 2003, in state court against G&G to
collect the balance of monies owing on the planks, defective or
not, supplied under the $660,600 contract.  That action became
the subject of a vigorous jurisdictional challenge by G&G that
was not finally resolved by the state court until some ten months
later by its order of November 25, 2003.  G&G then filed its
answer and counterclaim on December 22, 2003, and removed the
case on January 15, 2004, to the United States District Court for
the Northern District of Ohio.

The plaintiffs concede that the duty to defend did not

---

[4]Plaintiffs now contend that "G&G . . . , as a third-party
claimant, also has a right to recover its increased costs and
expenses incurred as a result of General Casualty's use of an
unfair trade practice."  (Pls.' Resp. at 11).  Plaintiffs offer
no supporting authority for this observation, nor do they direct
the court to evidence in the record supporting G&G's entitlement
to recompense for increased costs of litigation or, for that
matter, annoyance, aggravation, and inconvenience.  In any event,
this contention arises, if at all, from a failure to defend which
counsel for G&G specifically acknowledged is not made by G&G in
this civil action.  (Tr. at 22-23).

commence until the counterclaim was filed on December 22, 2003
(Tr. at 477).  Because General Casualty declined to defend North
American from the counterclaim, North American engaged its own
attorney, Mr. Fortney, who was already in the case, to do so.
Mr. Fortney did so for the next ten months until that action was
settled by agreement that North American would confess judgment
in the sum of $1,807,109.00, resulting in a judgment in that
amount entered on October 12, 2004.  North American thereby
incurred, as the parties have agreed, attorney fees to Mr.
Fortney of $40,100.00, together with related, though unstated,
costs of $2,253.74.  Those sums constitute the portion of
increased costs of litigation that, as the parties have also
agreed, are imposable by the court, not the jury.

It remained for the jury to determine the increased
costs of litigation, if any, otherwise incurred by North
American.  The trial record is devoid of any evidence that a
specific charge was incurred or a specific task was performed by
any officer or employee of North American that would not have
been required had General Casualty provided the defense.
Instead, North American's president, Richard Rickelman, testified
in rather vague generalities, as earlier quoted:

> North American . . . was required to spend time not
> only by myself, but the people that were employed by

North American . . ., we spent a lot of time working on
these issues.  We spent a lot of money with attorney
fees and preparing for this litigation.

* * *

The time that it took to discuss with Mr. Fortney the
case, the time that it took to -- for me to understand
the case fully, talking  with people involved at North
American . . ., took time away from mainly our bidding
process.

* * *

North American . . . was required . . . to hire Mr.
Fortney to defend us.  We were interviewing expert
witnesses to testify on our behalf.

North American during that ten-month period may have
spent some time and even money managing the G&G counterclaim
litigation, beyond attorney fees and costs, that was greater than
what would have been required of it had General Casualty defended
the G&G claim.[5]  A $1.7 million award, however, so far exceeds

_____

[5]Plaintiffs contend that "the jury reasonably concluded that
one result of General Casualty's failure to defend North American
in the underlying [Ohio] action was the entry of a judgment
against North American for approximately $1.8 million."  (Pls.'
Resp. at 12).  Inasmuch as the argument presupposes that North
American would not have suffered the same judgment with General
Casualty at the helm, the court rejects the contention as
speculative.

Moreover, even if a general award of consequential damages
were deemed contemplated by the more tailored compensatory
element for increased litigation costs, plaintiffs have failed to
produce adequate proof.  For example, to the extent North
American might have sought, in addition to increased litigation
(continued...)

the mark that one has no difficulty concluding that it qualifies as monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly demonstrates jury passion.  Considering the record in its entirety, the court is impressed with firm conviction that $100,000 is the highest jury award that would not contravene the Addair standard.

The $1,812,500 for aggravation, annoyance and inconvenience suffers from a similar evidentiary infirmity.  The

_____

[5](...continued)
costs, a recovery for lost profits or similar harm resulting from General Casualty's failure to defend, the proof obligations would have been substantial:

"Loss of profits may be recoverable in tort actions."
However, this Court has established stringent
prerequisites to such recovery. [W]e [have] held:

In order to recover for loss of profits as
the result of a tort, they must be such as
would be expected to follow naturally the
wrongful act, and are certain both in their
nature and the cause from which they proceed.

Moreover, the loss of profits must be established with
reasonable certainty and not be speculative or
conjectural in character or amount.  "Thus no recovery
can be had for loss of profits where it is uncertain
whether any profit at all would have been made by the
plaintiff."

Melbourne Bros. Const. Co. v. Pioneer Co., 181 W. Va. 816, 821,
384 S.E.2d 857, 862 (1989) (citations omitted).  The record lacks
any evidence of this character, or quantity, on the matter of
lost profits or economic harm of any similar type.

25

court has allowed for the indeterminate nature of this type of an award, while mindful of the admonition of the West Virginia Supreme Court of Appeals that it not include "punitive damages . . . under another sobriquet." Hayseeds, 177 W.Va. at 330, 352 S.E.2d at 80 (cited infra at 31).  Further, it is apparent that North American, faced with the potential for extraordinary liability stemming from a defective product and General Casualty's failure to fulfill its contractual obligation to cover the minor property damage portion and defend the whole claim, endured aggravation, annoyance, and inconvenience.  Again, however, considering the entire record, $200,000 is the highest award that could be made without offending Addair.[6]

Based upon the foregoing discussion, the court ORDERS that the posttrial and supplemental posttrial motions be, and they hereby are, granted insofar as they seek an unspecified remittitur.  It is further ORDERED that a total award of $300,000

_____

[6]General Casualty contends the damage award for increased costs of litigation (1) represents speculation and conjecture on the jury's part, and (2) North American would have incurred the "vast majority" of the increased costs regardless of whether General Casualty fulfilled its defense obligations.  It contends further that plaintiffs presented no evidence enabling the jury to properly compute the damages awarded for aggravation, annoyance, and inconvenience.  While each of these arguments is worthy of consideration, none of them is decisive on the question of whether some award is merited.

be, and it hereby is, treated as the outermost amount of damages that could be sustained based upon the record.

C.   The Second Argument -- Corporate Entities May Not Recover for Aggravation, Annoyance, and Inconvenience

Respecting the second argument, namely, that corporate entities cannot recover damages for aggravation, annoyance, and inconvenience, plaintiffs contend the argument is waived.  As noted, General Casualty delayed making the argument until its brief in support of the posttrial motions.  In response, General Casualty essentially asserts that, inasmuch as it raises its argument while the case is at the trial court level, before entry of judgment, the rule of waiver does not apply.

During Phase Two, the court convened with counsel just prior to closing arguments.  At that time, the court discussed with counsel the damage elements it was considering for presentation to the jury:

>    THE COURT:  Well, let me ask whether or not in your view a verdict form would be one that appropriately read a potential recovery for two aspects: One, aggravation, annoyance, and inconvenience; and the other, increased costs of litigation.
>
>    MR. KESNER:  Your Honor, I think that's right . . . .

THE COURT:  And so, the sum total of those two
items would constitute the award for phase two; to be
added, of course, to phase one; to be added, of course,
to the attorney fees and costs which the court finds
appropriate.

MR. KESNER:  I believe that's correct.

THE COURT: All right.  Mr. Rosenberg, are you in
sync with that?

MR. ROSENBERG:  Yes, absolutely, Your Honor.

(Trans. at 766).

Following closing arguments, the jury was instructed,

inter alia, as follows:

And so, if your verdict is for the plaintiff, you
may allow such sums as you believe from a preponderance
of the evidence will fairly and reasonably compensate
for damages to North American . . . proximately caused
by the defendant General Casualty . . . and that will
consist, as you will see on the verdict form, of any
increased costs of litigation and any aggravation,
annoyance, and inconvenience suffered as a result of
the defendant's failure to defend the counterclaim
filed in this case and for failure to provide indemnity
to the extent of the coverage for the damage to the
walls and floor.  Aggravation, annoyance, and
inconvenience often accompany the sense that one is
being treated unfairly and you may reasonably infer
that a plaintiff has suffered aggravation, annoyance,
and inconvenience as a result of, for example, a
violation of the West Virginia Unfair Trade Practices
Act by the defendant. . . .

(Trans. at 832-33) (emphasis supplied).

At the conclusion of the charge, the court inquired of

counsel as to whether they had "any objection or exception to

28

take to the court's charge to the jury?" (<u>Id.</u> at 841).  After
plaintiffs recited their objections, the court inquired anew:
"And does the defendant have any objection?"  (<u>Id.</u> at 843).
Defense counsel observed only as follows:

> Your Honor, only as I indicated last night, I think
> aggravation, annoyance, and inconvenience are
> substantially prevailing issues.  The court has made it
> clear and we respect the court's decision, but I
> reserve it.

(<u>Id.</u>)[7]

Rule 51(c)(1) provides as follows: "A party who objects
to an instruction . . . must do so on the record, stating
distinctly the matter objected to and the grounds for the
objection."  <u>Id.</u>  Rule 51(c)(2) controls "When to Make"
objections:

> (2) When to Make. An objection is timely if:
>
> > (A) a party objects at the opportunity provided
> > under Rule 51(b)(2)[, namely, on the record and
> > out of the jury's hearing before the instructions
> > and arguments are delivered]; or

---

[7]Counsel was referring to his argument throughout the case
that it was incumbent upon plaintiffs to substantially prevail on
their coverage claim in order to recover extracontractual damages
under the West Virginia jurisprudence governing common law bad
faith claims.  Syl. Pt. 1, <u>Hayseeds, Inc. v. State Farm Fire &</u>
<u>Cas.</u>, 177 W.Va. 323, 352 S.E.2d 73 (1986)("Whenever a policy-
holder substantially prevails in a property damage suit against
its insurer, the insurer is liable for: (1) the insured's
reasonable attorneys' fees in vindicating its claim; (2) the
insured's damages for net economic loss caused by the delay in
settlement[;] and [ (3)] damages for aggravation and
inconvenience.").

> > (B) a party was not informed of an
> > instruction or action on a request before
> > that opportunity to object, and the party
> > objects promptly after learning that the
> > instruction or request will be, or has been,
> > given or refused.

Fed. R. Civ. P. 51(c)(2).  The assignment of error is limited to

"an error in an instruction actually given, <u>if that party</u>

<u>properly objected</u> . . . ."  Fed. R. Civ. P. 51(d)(1)(A) (emphasis

supplied).

        Under the former version of the Rule, our court of

appeals observed as follows:

> Rule 51 of the Federal Rules of Civil Procedure
> provides: "No party may assign as error the giving or
> the failure to give an instruction unless that party
> objects thereto before the jury retires to consider its
> verdict. . . . "  Fed. R. Civ. Proc. 51 (2003)(amended
> 2003).  <u>By agreeing to an instruction which</u>
> <u>specifically authorized the verdict returned by the</u>
> <u>jury, GATX waived its right to argue on appeal that the</u>
> <u>jury was required to award a greater amount</u>.

<u>First Union Commercial Corp. v. GATX Capital Corp.</u>, 411 F.3d 551,

556-57 (4th Cir. 2005) (citations omitted) (emphasis supplied).

The aforementioned waiver principles remain intact following the

2003 amendment.   The leading commentators summarize the present

rule:

> There can be no final retirement of the jury until an
> opportunity has been afforded for objections to the
> court's instructions, but a party cannot claim error in
> the giving or failure to give an instruction unless an
> objection is made at that time.

>         . . . .

> The purpose of Rule 51 is well understood by the
> federal courts and the rule is applied in light of it.
> . . . The unobjected to matter simply no longer is
> subject to contest in the remainder of the case.

9C Charles A. Wright <u>et</u> <u>al.</u>, <u>Federal Practice and Procedure</u> §
2551 (3rd ed. 2008); <u>see</u> <u>also</u> <u>id.</u> § 2553 ("As many courts have
held, objections under Rule 51(c) to the instructions made after
the jury retires and has begun deliberating are not timely and
will not be considered on appeal or on a motion for a new trial.
. . . It certainly is too late to object to a charge after a
verdict has been returned.").

Moreover, and principles of waiver aside, defendant's
arguments fails in substance.  In <u>Hayseeds, Inc. v. State Farm</u>
<u>Fire & Casualty</u>, 177 W.Va. 323, 352 S.E.2d 73 (1986), the lone
plaintiff in the case style appears to have been a corporate
entity.  The supreme court of appeals' observations are
noteworthy respecting the damages recoverable:

> Accordingly, we hold today that <u>when a</u>
> <u>policyholder</u> substantially prevails in a property
> damage suit against an insurer, <u>the policyholder</u> is
> entitled to damages for net economic loss caused by the
> delay in settlement, as well as an award for
> aggravation and inconvenience.
>
> However, in allowing an award for aggravation and
> inconvenience, we do not intend that punitive damages
> be awarded under another sobriquet.  For example, <u>a</u>
> <u>large corporation</u> with an in-place, organized
> collective intelligence that must litigate a claim for

31

> several years <u>may suffer</u> substantial net economic loss
> but <u>little aggravation and inconvenience</u>.  On the other
> hand, a family of five that is required to live for
> four years in a trailer because an insurance company
> has declined to pay the fire policy on their $200,000
> house suffers little net economic loss but an enormous
> degree of aggravation and inconvenience.

<u>Id.</u> at 330, 352 S.E.2d at 80 (emphasis supplied).  This excerpt

indicates an award of damages to a corporate entity for

aggravation, annoyance, and inconvenience is contemplated by West

Virginia law.

        To the extent an error occurred, it was neither plain

nor preserved in accordance with the mandatory provisions of Rule

51.  General Casualty has thus waived its contention that

corporate entities may not recover damages for annoyance,

aggravation, and inconvenience.[8]  The court, accordingly, ORDERS

---

[8]Distinct from the strictures of Rule 51, General Casualty's
failure to seasonably raise the second argument appears fatal for
another reason.  <u>See</u> <u>Unitherm Food Sys., Inc. v. Swift-Eckrich,
Inc.</u>, 546 U.S. 394[, 398 n.1] (2006) (stating "'A post-trial
motion for judgment can be granted only on grounds advanced in
the pre-verdict motion.'" (quoting Comm. Note on Amendments to
Federal Rules of Civil Procedure, 134 F.R.D. 525, 687 (1991));
<u>DeCorte v. Jordan</u>, 497 F.3d 433, 438 (5th Cir. 2007) (stating "We
caution that Rule 50(a) motions should be . . . specific, as
required by Rule 50(a)(2)."); <u>Tuttle v. Metropolitan Government
of Nashville</u>, 474 F.3d 307, 316 (6th Cir. 2007)("A post-verdict
judgment as a matter of law 'is not available at anyone's request
on an issue not brought before the court prior to submission of
the case to the jury.'").  <u>Compare</u> <u>Van Alstyne v. Electronic
Scriptorium, Ltd.</u>, 560 F.3d 199, 203 n.3 (4th Cir. 2009).
General Casualty apparently recognizes the content of the Rule.
                                              (continued...)

that this portion of the posttrial and supplemental posttrial motions be, and it hereby is, denied.

### III.

Based upon the foregoing, the court ORDERS that the total damages awarded by the jury in Phase Two be, and they hereby are, reduced to $300,000 or, in the alternative, that a new trial be granted <u>nisi</u> remittitur as to the damages awarded at Phase Two, at plaintiffs' option, to be noticed in writing to the court and opposing counsel no later than September 25, 2009.  The $94,474.71 verdict for property damage covered by the insurance policy is left intact.

Based upon the proposed judgment order filed by the parties on September 23, 2008, it appears agreement has been reached concerning the attorney fees, costs, and pre- and post-judgment interest due and owing.  Absent an objection filed on or before September 25, 2009, the court will presume the contents of the September 23, 2008, proposed judgment order accurately reflect the parties' agreed resolution of those matters.

---

[8](...continued)
<u>See</u> Def.'s Memo. in Supp. at 15 ("A party is required to raise the reason for which it is entitled to judgment as a matter of law in a Rule 50(a) motion before the case is submitted to the jury and to reassert that reason in its Rule 50(b) motion after trial.").

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED:  September 15, 2009

John T. Copenhaver, Jr.
United States District Judge