UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**NORTH AMERICAN PRECAST, INC. and**
**G&G BUILDERS, INC.**

       **Plaintiffs**

**v.**　　　　　　　　　　　　**CIVIL ACTION NO. 3:04-1307**

**GENERAL CASUALTY COMPANY OF WISCONSIN,**
**a Wisconsin corporation,**

       **Defendant**

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are plaintiffs' motions (1) in limine to preclude defendant from arguing that it did not know that West Virginia law would apply to the handling of the underlying claims, (2) in limine to preclude defendant from arguing that it did not receive proper notice of the underlying claim, and (3) for reconsideration of the court's ruling on plaintiffs' punitive damages claim. Also pending are defendant's motions in limine (1) to limit the testimony of Richard Rickelman, (2) to preclude evidence regarding specific subject matters, and (3) to preclude the testimony of Gary Young. All of the motions were filed December 11, 2009.

I.


        The factual and procedural development underlying this
action are discussed in full in the court's September 15, 2009,
memorandum opinion and order and are not restated here.


A.   To Preclude Defendant from Arguing that it Did Not Know that
     West Virginia Law Would Apply to the Handling of the
     Underlying Claims


        Inasmuch as the court previously concluded that West
Virginia law governed this action, plaintiffs seek to prohibit
defendant from asserting at retrial that its employees did not
know that West Virginia law would apply to their handling of the
underlying claims ("applicable law defense").  Plaintiffs note
that during closing arguments in Phase Two of the first trial,
defendant's counsel asserted the applicable law defense.

        Defendant responds that retrial is limited to
ascertaining the appropriate amount of damages to be awarded for
plaintiffs' Phase Two claims for breach of the underlying
insurance contract, bad faith, and violation of the West Virginia
Unfair Trade Practices Act.  Further, during the pretrial
conference held January 5, 2010, counsel stipulated that the

                              2

applicable law defense would become relevant only in the event that the court permitted the jury to consider the issue of punitive damages.  As so limited, the matter is no longer controverted.

The court, accordingly, ORDERS that the motion to preclude defendant from arguing that it did not know that West Virginia law would apply to the handling of the underlying claims be, and it hereby is, denied as moot.

B.   To Preclude Defendant from Arguing That it Did Not Receive
     Proper Notice of the Underlying Claim

Plaintiffs assert that defendant should be prohibited from asserting at retrial the defense that plaintiffs failed to provide adequate or timely notice of the underlying claim ("notice defense").  During the pretrial conference held January 5, 2010, counsel for defendant conceded that evidence and argument relating to the notice defense are irrelevant.  The court, accordingly, ORDERS that the motion to preclude defendant from arguing that it did not receive proper notice of the underlying claim be, and it hereby is, denied as moot.

3

C.   **For Reconsideration of the Court's Ruling on Plaintiffs'**
     **Punitive Damages Claim**


          Plaintiffs next move for reconsideration of the court's

ruling during Phase Two of the first trial that struck the

request for punitive damages.  The ruling appears below:

> The court finds that the evidence, viewed in the
> light most favorable to the plaintiff, does not rise to
> the level of actual malice required for a punitive
> damages award.
>
> The collapse of the plank that has been found by
> the jury to have caused property damage to have
> required an expenditure of some $94,000 for repair
> occurred on July 1, 2002.  The state shut down the
> project for a matter of months while planks already
> installed were examined and testing took place.  In
> December, the repairs resulting from the collapse of
> the plank were completed.
>
> It was not until January 23, 2003, after the
> repairs had been completed, that General Casualty
> received a notice of claim by G&G [Builders, Inc.
> ("G&G")] against North American.  While the claim and
> accompanying note from the insurance agent, Cairl
> Dacar, to General Casualty's Deborah Keisler indicated
> property damage, the only evidence presented of it were
> the photos admitted as exhibit 1 which depict debris
> rather than a graphic display of damage to the walls
> and floor.  That does not absolve General Casualty from
> its duty to investigate, but its failure to do so does
> not meet the high threshold of actual malice required
> by the law of West Virginia governing this case.
>
> Moreover, even in denying coverage, which denial
> was appropriate as to 95 percent of the 1.8 million
> claim in this case, the denial letter of July 8, 2003,
> and those that followed, held open an invitation to the
> insured to show the property damage.

(Trans. at 774-75).

Plaintiffs contend that reconsideration is appropriate inasmuch as the evidence previously presented at trial raises "a genuine question of fact" with regard to defendant's knowledge, but denial, of its defense and coverage obligations. (Mot. at 2). A summary of the evidence and argument relied upon by plaintiffs follows.

First, plaintiffs note that defendant's agent sent a January 23, 2003, e-mail to defendant's adjuster, Ms. Keisler, stating:

> There is additional property damage caused by the collapse, however I don't have specific information regarding that. They are also claiming adverse impacts including "project delays, repair/replacement of defective product, precautionary reinforcement measures, additional testing and inspection . . . ."

The same day, Ms. Keisler acknowledged that the policy would cover any claim for resulting property damage when she indicated in a Claims Set-up Requisition form as follows: "Our policy would respond to resultant damage if a case of liability is established against the insd."  She testified similarly at trial.

Second, plaintiffs note Ms. Keisler's testimonial admission at trial that it was defendant's obligation to investigate the coverage statement above by its agent in order to determine if any of the damages claimed by G&G against North

5

American were covered under the policy.  Plaintiffs additionally
assert that defendant never investigated the claim nor allowed
G&G an opportunity to submit information respecting the scope of
its damages.  Ms. Keisler also acknowledged that defendant had
received photographs depicting the scene of the collapse where
the resultant damage had occurred. (Tr. at 372 (where she states
that she had received photographs of "[t]he plank that was at
issue here that collapsed and the debris from that on the floor
and against the walls.").

        Third, on July 8, 2003, defendant sent a coverage
denial letter bearing that date to North American's privately
retained counsel, Mr. Fortney. (Tr. Ex. 23, (letter stating "The
only allegation apparent is that the plank was defective in
product manufacture. In the absence of resulting property damage
or bodily injury, General Casualty does not have an obligation to
defend or otherwise indemnify its insured for the claims made by
G&G Builder . . . .")

        Fourth, on July 26, 2004, Mr. Fortney sent to
defendant's counsel a letter spelling out in detail why a
coverage and defense obligation existed.  The letter relied upon
discovery responses and applicable policy language.  It is
further noted that, in commenting at trial on why the July 26,

                                6

2004, letter was sent, Mr. Fortney observed that "It was yet again an attempt by North American . . . to have . . . General Casualty defend and indemnify North American . . . ."  (Tr. at 328-29 (emphasis added)).  On November 15, 2004, another denial letter was sent from defendant to Mr. Fortney stating that "The information provided does not establish coverage pursuant to the policies of insurance issued by General Casualty Company to North American Precast," (see Plaintiffs' Trial Exhibit No. 34).

Fifth, plaintiffs point to a more recent event they believe indicates an entrenched position on defendant's part, noting defendant's failure to pay the damages related to Phase One of the first trial, $94,474.71, until November of 2009.

A jury might properly infer that the foregoing evidence warrants a finding that defendant harbored a preconceived notion to deny coverage and hence a defense.  That intention, however, does not rise to the level of actual malice.  See McCormick v. Allstate Ins. Co., 202 W.Va. 535, 539, 505 S.E.2d 454, 458 (1998) ("We ultimately concluded in Hayseeds that the insurance company's 'preconceived disposition to deny the claim ... did not rise to the level of malice' necessary for an award of punitive damages.") (quoting Hayseeds, Inc. v. State Farm Fire & Cas., 177 W. Va. 323, 331, 352 S.E.2d 73, 81 (1986).

7

The actual malice standard envisions much more, namely, a showing upon which one might base a finding of intentional and extraordinary misconduct not encountered in the usual case of common-law or statutory bad faith:

> "[P]unitive damages for failure to settle a property dispute shall not be awarded against an insurance company unless the policyholder can establish a <u>high threshold of actual malice</u> in the settlement process. By "actual malice" we mean that the company <u>actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally denied the claim</u>. We intend this to be a bright line standard, <u>highly susceptible to summary judgment</u> for the defendant, such as exists in the law of libel and slander, or the West Virginia law of commercial arbitration.  Unless the policyholder is able to introduce <u>evidence of intentional injury -- not negligence, lack of judgment, incompetence, or bureaucratic confusion</u> -- the issue of punitive damages should not be submitted to the jury."

<u>McCormick</u>, 202 W. Va. at 539, 505 S.E.2d at 458 (emphasis added) (quoting <u>Hayseeds</u>, 177 W.Va. at 330-31, 352 S.E.2d at 80-81) (citations omitted).  The evidentiary showing offered by plaintiffs does not approach the high standard set forth in <u>Hayseeds</u> and its progeny.[1]

_____

[1]Plaintiffs cite <u>Berry v. Nationwide Mutual Fire Ins. Co.</u>, 181 W. Va. 168, 175, 381 S.E.2d 367, 374 (1989), and <u>Dodrill v. Nationwide Mutual Ins. Co.</u>, 201 W. Va. 1, 14, 491 S.E.2d 1, 14 (1996), in support of their request for reconsideration.  Both cases are readily distinguished.  The decision in <u>Berry</u> involved a homeowner claiming blasting damage to his residence by an insured tortfeasor.  During an inspection of the home by
(continued...)

The court, accordingly, ORDERS that plaintiff's motion for reconsideration of the court's ruling on plaintiffs' punitive damages claim be, and it hereby is, denied.

D.    To Limit the Testimony of Richard Rickelman and to Preclude Evidence of Specific Subject Matters[2]

Defendant contends that plaintiffs should be barred from adducing evidence in a number of areas as follows: (1) the existence of, or details related to, the Agreed Judgment Entry and Settlement Agreement ("agreed judgment") as confessed by

---

[1](...continued)

plaintiff and representatives of the tortfeasor's insurer, plaintiff disclosed that he had actually seen some of the damage take place during the insured's blasting activity.  The damage included substantial glass breakage and other obvious property damage.  The insurer nevertheless denied coverage and one of its inspectors additionally held himself out as an expert in blasting damages, which turned out to be false.  Additionally, a report submitted by a company retained to perform blast testing in aid of evaluating the claim did not perform its tests on plaintiff's property but another residential property instead.  The claim was ultimately denied based, in part, upon that errant report.

In Dodrill, among other factors, liability was uncontested and the insurer prolonged negotiations concerning settlement for two-and-one-half years following the plaintiff's injury.  Expert testimony established that the initial offers made by the insurer were unreasonable and that the insurer refused to settle even when the parties' demand and offer were separated by just $1,000.  Further, plaintiff recovered on the underlying claim twice the amount of the insurer's final offer.  Neither Berry nor Dodrill bear any evidentiary resemblance to this action.

[2]Inasmuch as these two motions overlap in significant respects, the court treats them in a consolidated fashion.

9

North American to G&G in the underlying action, (2) the amount of the agreed judgment, (3) the amount of attorney fees paid by North American to Mr. Fortney to compensate him for services rendered during the underlying action, (4) the damages sought by G&G against North American as a result of the damage caused by the failed plank, (5) the current business status of North American, (6) the coverage amounts of the underlying policy issued to North American by defendant, and (7) the contract amount for the construction project affected by the failed plank. Defendant contends that these subjects are irrelevant inasmuch as retrial is limited to the question of damages.

In particular, defendant asserts that (1) any damages suffered by G&G, except for those directly related to property damage resulting from the failed plank, along with the contract amount for the G&G construction contract, are irrelevant to the issue for retrial, (2) the determination of fees payable to Mr. Fortney was reserved to the court and not the jury, (3) North American's current status is irrelevant, as reflected by the court disallowing inquiry into that area during Phase Two[3], and

_____

[3]During Phase Two, the following exchange, and ruling, occurred:

Q.  What's the status of North American Precast today?

MR. ROSENBERG:  Objection, Your Honor.

THE COURT:  Sustained.

(continued...)

(4) evidence regarding the coverage limits of the underlying
policy are likewise irrelevant to the damages sustained as a
result of defendant's breach of contract, bad faith, and
violation of the Unfair Trade Practices Act.

Plaintiffs respond that evidence in each of the
aforementioned areas relates to how defendant's refusal to defend
covered claims adversely affected North American's business,
resulting in damages that they assert fall within "precisely the
issue to be retried . . . ." (Resp. at 7). They suggest that
the damages to which an insured such as North American is
entitled for the three claims at issue are as follows:

> The entire amount of the judgment rendered in the
> underlying action, _e.g._, $1,800,000 plus interest,
> irrespective of the fact that sum exceeds defendant's
> policy limits.
>
> Additional costs shown to naturally result from breach
> of the underlying insurance contract, such as for
> destruction of a going concern.

Based upon these asserted contours of its damages
claim, plaintiffs assert that they must be permitted to explore,
inter alia, (1) the monetary harm to North American, including
annoyance and inconvenience, resulting from its efforts to manage
and settle the underlying action, (2) "other [unspecified]

---

[3](...continued)
(Tr. at 76).

economic damages caused by the breach," including the amount of the underlying judgment (mot. at 11), (3) the terms of the settlement that North American was putatively compelled to accept leading to the agreed judgment, and (4) the fact that North American eventually collapsed. Plaintiffs also assert that inasmuch as North American had viable defenses to the underlying action, a jury could reasonably conclude that one result of the refusal to defend was entry of the $1,800,000 judgment. Further, plaintiffs contend that (1) the financial threat posed by the sums sought by G&G in the underlying action is meaningful in determining the level of annoyance and inconvenience at issue, and, overall, (2) the categories of evidence sought to be excluded by defendant provide a critical evidentiary context for the jury's determination of the appropriate amount of damages to be awarded.

If plaintiffs are able to lay an appropriate evidentiary foundation, it may be the case that a number of areas of inquiry would be relevant to the nature of the annoyance and inconvenience suffered by North American. For example, the amount of, and events leading up to, the agreed judgment in the underlying action might inform the jury of the level of financial pressure and frustration experienced by North American in

attempting to discharge the obligations defendant should have undertaken on its behalf.  The amount of attorney fees expended and the current status of North American would seem to fall categorically outside this boundary limit but the stakes of the underlying action generally, and its outcome, might well be a proper subject of inquiry depending upon the foundation laid.

The court, accordingly, ORDERS that the motions to limit the testimony of Richard Rickelman and to preclude evidence of specific subject matters be, and it hereby is, granted insofar as it seeks to bar evidence respecting the current status of North American, and the amount of attorney fees expended by it, and denied without prejudice in all other respects dependent upon the nature of the proof offered at trial.

E.   To Preclude the Testimony of Gary Young

Defendant next asserts that Gary Young should be prohibited from testifying during the retrial inasmuch as he "has no personal knowledge regarding the limited issues to be retried" (Mot. at 1).  Specifically, defendant asserts as follows:

> Young is the sole owner and President of [G&G] . . . At no time has he had any interest in North American . . . or any knowledge regarding the goings on of its business dealings.  Mr. Young offered testimony during

13

> Phase I and Phase II of the trial in this matter.
> During Phase I, Mr. Young testified regarding G&G's
> role in the construction of the Western Regional Jail
> and its business dealings with North American . . .
> both before and after the collapse of the [plank] . . .
> and the effect the collapse had on the project as a
> whole and on property at the project. During Phase II,
> Mr. Young testified regarding G&G's contact with . . .
> [defendant] regarding its claim against North American
> . . . and the litigation that ensued between North
> American . . . and G&G as a result of the collapsed
> plank.
>
> He can offer <u>no</u> testimony regarding any damages
> suffered by North American . . . for increased cost of
> litigation -- excluding attorneys fees and costs and/or
> aggravation, annoyance and inconvenience, which is the
> sole issue to be retired [sic]. Similarly, and quite
> significantly, Mr. Young was not permitted, by the
> Court, to offer testimony previously regarding what
> impact, if any, Defendant's denial of coverage and its
> claim handling practices had on G&G . . . .

(Mot. at 3 (emphasis in original)).

Defendant also notes the following language from the

court's September 15, 2009, memorandum opinion and order

respecting G&G's involvement in this litigation:

> Plaintiffs now contend that "G&G . . . , as a
> third-party claimant, also has a right to recover its
> increased costs and expenses incurred as a result of
> General Casualty's use of an unfair trade practice."
> (Pls.' Resp. at 11). Plaintiffs offer no supporting
> authority for this observation, nor do they direct the
> court to evidence in the record supporting G&G's
> entitlement to recompense for increased costs of
> litigation or, for that matter, annoyance, aggravation,
> and inconvenience. In any event, this contention
> arises, if at all, from a failure to defend which
> counsel for G&G specifically acknowledged is not made
> by G&G in this civil action. (Tr. at 22-23).

<u>North American Precast, Inc. v. General Cas. Co.</u>, No. 3:04-1307,

slip op. at 22 n.4 (S.D. W. Va. Sept. 15, 2009).

Plaintiffs respond that (1) paragraphs 53 through 57 of the complaint assert Unfair Trade Practice Act claims on behalf of both plaintiffs, and (2) G&G qualifies as a third-party claimant entitled to relief for violation of its implied rights under the Unfair Trade Practices Act and Jenkins v. J.C. Penney Casualty Insurance Co., 167 W. Va. 597, 280 S.E.2d 252 (1981).

The allegations of the complaint, filed in 2004, are immaterial for the purpose of this analysis.  They were superseded by the proposed integrated pretrial order entered August 13, 2008.  See Rockwell Intern. Corp. v. United States, 549 U.S. 457, 476 (2007); Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 401-02 (4th Cir. 1999) ("Our conclusion that the conversion claim was never properly at issue as the case proceeded is supported by the pretrial order.  . . . [Rule] 16(e) provides that the pretrial order 'shall control the subsequent course of action.' . . . The order sets forth only theories sounding in the First, Fourth and Fourteenth Amendments to the Constitution.  It nowhere mentions a claim for conversion or any state or pendent claim.  Thus, even if the plaintiff initially had a colorable argument that Count Three of the complaint had somehow stated a conversion claim, the failure to include a conversion claim in the pre-trial order would have removed it from issue.").

15

There are a series of points in the record that contradict the notion that G&G pursued a third-party Unfair Trade Practices Claim.  One refers first to the integrated pretrial order entered August 13, 2008, the day trial began.  A comparison of the substance of plaintiffs' response to the instant motion with the August 13, 2008, integrated pretrial order illuminates the issue.  The plaintiffs' response repeatedly refers to the words "third party" in relation to G&G's supposed independent claim under <u>Jenkins</u>; those same two words appear nowhere in the August 13, 2008, integrated pretrial order.[4]

_____

[4]One would expect those two words to appear under Section III of the integrated pretrial order, entitled "Plaintiffs' Elements of Proof."  (PTO at 8).  Instead, under section III.C covering the Unfair Trade Practice Act claims, no mention is made of a G&G claim separate and apart from the North American claims under that statute.

Another point in the pretrial order where the lack of specificity is troubling is Section V, which contains "Plaintiffs' Summary of Material Facts."  (PTO at 9).  At page 11, plaintiffs state as follows:

> [T]he parties are now proceeding to trial to determine the extent of the damage to the masonry walls and concrete floor and on the Plaintiffs' breach of contract, bad faith and Unfair Trade Practices Act claims related to and arising from <u>General Casualty's failure to defend and indemnify North American Precast, as well as its violations of the West Virginia Unfair Trade Practices Act in connection with the claims of G & G</u> . . . .

(PTO at 11 (emphasis added)).  One cannot discern if the underscored language refers to a separate, putative Unfair Trade (continued...)

Second, after the jury's verdict was received as to Phase One on August 15, 2008, the court made the following observation:

> With respect to phase two, the court would ask the parties whether or not we are to proceed in accordance with that which is set forth in plaintiffs' elements of proof insofar as it relates to phase two which is effectively restated under contested issues of fact being the plaintiffs' version, all of which appears in the pretrial order.  The easy part of this is that there is an Unfair Trade Practices Act <u>claim</u> in the case.  The question is what else.  And I would like to hear the parties now on that matter.

(Tr. at 455 (emphasis added)).  A discussion ensued with counsel concerning what was to be submitted to the jury for Phase Two. To further clarify the issues discussed, the court invited plaintiffs to file a brief the following day.  The brief, filed August 16, 2008, is entitled "Plaintiffs' Memorandum of Law on Causes of Action and Damages Claims to be Addressed in Phase Two of Trial."  Except for the opening sentence identifying the plaintiffs, G&G is not mentioned in the text of the brief.

The brief first discusses the damages sought under the breach of contract claim as follows:

---

[4](...continued)
Practices Act claim by G & G as a first-party additional insured, as a third-party, or simply as an entity with respect to whom defendant committed violations of the Unfair Trade Practices Act in a manner supportive of North American's claim that defendant violated the statute with such frequency as to constitute a general business practice.  As demonstrated <u>infra</u>, a third-party claim was not prosecuted at trial.

The Plaintiffs have asserted a claim against General Casualty for its breach of the insurance contract based upon its refusal to defend Plaintiff North American Precast ("NAP") in the underlying action and its refusal to indemnify NAP for those claims which were covered by the subject insurance policy.

. . . .

Here, the Plaintiffs are seeking to recover all damages arising from the General Casualty's breach of the insurance contract, including the attorneys fees and costs incurred in defending the underlying litigation and pursuing this declaratory judgment action [to be calculated by the court], the damages to NAP's business resulting from having to manage the underlying litigation and ultimately settle it, the annoyance and inconvenience associated with that process, and the other economic damages the jury finds to have been caused by the breach.

(Id. at 2, 4 (footnote omitted)).

In next discussing the claim for breach of the implied duty of good faith and fair dealing, plaintiffs noted that "the West Virginia State Supreme Court has held that a cause of action for violations of the duty of good faith and fair dealing . . . only exists for first party insureds such as NAP." (Id. at 6). Respecting the damages available, plaintiffs noted that "many of the elements of damage resulting from this Defendant's breach of its duty of good faith and fair dealing are the same as those available for the breach of contract claims, [but] there are some important distinctions." (Id. at 6). According to the text of the brief that follows on pages 6-7, the "distinctions" appear limited to the matter of attorney fees.

18

The brief concludes with a discussion of the Unfair
Trade Practices Act claim.  The words "third party" appear
nowhere therein.  Neither is G&G mentioned separately from North
American.  Respecting the relief sought, plaintiffs stated as
follows:

> It is anticipated that most of these damages will be
> duplicative of the damages available for General
> Casualty's breach of contract and/or its violation of
> the duty of good faith and fair dealing (common law bad
> faith).

(Id. at 8).  In the "Conclusion" section of the brief, plaintiffs
note that they "seek to recover damages from General Casualty as
outlined above . . . . [and] that many of these damages are
duplicative . . . ."  (Id.)  So limited, it is  not possible to
conclude from the brief that G&G was pursuing a third-party claim
under the Unfair Trade Practices Act in Phase Two.

Third, neither does plaintiffs' opening statement
suggest in any way that a third-party Unfair Trade Practices Act
claim is being pursued.

Fourth, the opening portion of plaintiffs' counsel's
closing argument confines the damages requested to those sought
by North American:

> Damages.  I've mentioned the elements of damages for
> breach of contract, for violations of the Unfair Trade

Practices Act, and for bad faith are the same.  It
deals with consequential damages.  The annoyance,
aggravation, and inconvenience of dealing with the
litigation, of having to manage that.  You've heard the
testimony of the witnesses regarding how they were
required to devote time and resources, to paying for
North American for paying for its defense, for
overseeing litigation in a way that they had to meet,
Mr. Rickelman, with experts, and manage the litigation
in such a way that it took away from his ability to
conduct his business operations.  That's annoyance.
That's inconvenience.  That's aggravation.  And the
consequence of that is that their business shut down,
the workers are out, he bled to death, North American
Precast bled to death, and shut down.  The workers are
gone.  That's the consequence, that's the damages.

(Tr. 794-95).

Finally, certain excerpts from the court's charge to

the jury disclose the actual parameters of the claims at

issue at that point in the case:

And so, if your verdict is for the plaintiff, you may
allow such sums as you believe from a preponderance of
the evidence will fairly and reasonably compensate <u>for
damages to North American Precast</u> proximately caused by
the defendant . . . and that will consist, as you will
see on the verdict form, of any increased costs of
litigation and any aggravation, annoyance, and
inconvenience suffered as a result of the defendant's
failure to defend the counterclaim filed in this case
and for failure to provide indemnity to the extent of
the coverage for the damage to the walls and floor.

. . . .

[Y]ou also heard testimony in the case that indicated
that because . . . [defendant] didn't provide a
defense, it was necessary for North American to manage
its own defense.  Now, doubtless, North American would
have to have done some of the same things even if . . .
[defendant] had provided a defense, that is, it would

20

have to make available its records and its witnesses
and the like to aid . . . [defendant] and . . . [its]
attorney . . . . But it is suggested that there were
other costs that stemmed from the necessity of doing
various things, whatever they may have been, that would
have been in addition to that which would have been
necessary had . . . [defendant] filed a defense and
given a defense to North American throughout.

[You] will include what further costs, if any there
were, that would have been <u>incurred by North American
in the course of providing a defense</u>, as it did, in
that underlying action.

        . . . .

Compensation for annoyance and inconvenience, as well
as aggravation, include damages for the annoyance and
inconvenience <u>suffered by North American Precast</u> during
the entire claims process which you find to have been
proximately caused by and resulted from the
defendant['s] . . . breach of contract, breach of
covenant of good faith and fair dealing, and/or unfair
trade practices action.

(Tr. at 832-833, 834, 835) (emphasis added).

        The charge in its entirety, and in particular with

respect to the issue of damages, discloses that only the claims

of North American were asserted, with G&G undertaking the role of

prosecuting them as North American's assignee.[5]  It is noteworthy

---

[5]An additional reference, stated earlier in the charge to
the jury, provides as follows:

Now, before getting into the meat of the instructions
on this phase, I want to note a few things to you.
There are two party plaintiffs in the case:  North
American Precast and G&G Builders.  The reality is, as
you have heard, that North American assigned its
judgment, its claim to G&G.  And so, it would have been
sufficient in this case if G&G alone had appeared as
                                        (continued...)

that plaintiffs offered no objection to the charge and appeared to specifically endorse the damages portion set forth above. (Tr. at 843 (plaintiff's counsel "Your Honor, I'm not dissatisfied in any way regarding the jury's consideration of the element of damages.")).

Plaintiffs now appear to contend that they were asserting the putative third-party Unfair Trade Practices Act claim on behalf of G&G until a single event, namely, a sustained objection during the direct examination of Mr. Young, in essence granted judgment as a matter of law on the claim.[6]  Suffice to

─────────────────

[5](...continued)
the assignee of North American, but that is not the way the case has proceeded.  And as a consequence, the court will have you, once again, proceeding with the two plaintiffs, but understanding that this is really a claim held now by G&G, although it's based on that which occurred to North American. . . .

(Tr. 823-24).

[6]The exchange is as follows:

Q.  It's been almost six years since this matter. What impact has General Casualty's denial of coverage and its claim handling practices had on G&G Builders?

MR. ROSENBERG:  Objection, Your Honor.

THE COURT:  Let me see counsel at the bench, please. (At side bar.)

MR. ROSENBERG:  This case is based -- this case is based on an assignment from North American Precast to G&G.  That's what this case is about.  It is -- the impact upon G&G is irrelevant to any issue here.  It's
(continued...)

22

say that counsel's contention concerning the scope of the court's ruling, and plaintiffs' asserted subsequent course of action based upon this isolated exchange, strains credulity.  This is especially so in view of the fact that the brief filed August 16, 2008, which contains no third-party claim, was filed in advance of Mr. Young's testimony.

As noted by defendant, the retrial is confined "to the damages awarded at Phase Two . . . ."  North American Precast, Inc. v. General Cas. Co., No. 3:04-1307, slip op. at 33. Testimony in support of a third-party Unfair Trade Practices Act claim not presented at the trial is deemed beyond the scope of the limited retrial chosen by plaintiffs.

---

[6](...continued)
not pled in their complaint.  It's not part of their complaint.  We have no obligation to them in that regard.  This is an assignment of NAP's claim to G&G.

And, second, if this line of testimony is allowed, I mean, it's opening the door to all the things that this court has said  are not covered, like incidental and consequential damages.

MR. KESNER:  We're not getting into all that. This is  actually a very short question and expected response, but what it relates to is the UTPA claim, and there has specifically been a UTPA claim presented.  I mean, I asked him specifically and  limited the question to what impact did the delay -- I mean, a UTPA case commonly referred to as a delay case, what impact did the delay have on G&G.

THE COURT:  The objection is sustained.

(Tr. 677-78).

23

That is not to say, however, that any testimony offered by Mr. Young would be categorically irrelevant.  As noted _supra_, it may be the case that plaintiffs can lay an appropriate evidentiary foundation for testimony by Mr. Young concerning the level of financial pressure and frustration imposed upon North American by the underlying action.  A critical component of any such proffered testimony, however, would be a showing that Mr. Young possesses personal knowledge of those matters to which he would propose to testify.

The court, accordingly, ORDERS that defendant's motion to preclude the testimony of Gary Young be, and it hereby is, denied without prejudice dependent upon the nature of the proof offered at trial.

II.


Based upon the foregoing discussion, it is ORDERED as follows:

1.    That the motion to preclude defendant from arguing that it did not know that West Virginia law would apply to the handling of the underlying claims be, and it hereby is, denied as moot;

2.    That the motion to preclude defendant from arguing that it did not receive proper notice of the underlying claim be, and it hereby is, denied as moot;

3.    That plaintiff's motion for reconsideration of the court's ruling on plaintiffs' punitive damages claim be, and it hereby is, denied;

4.    That the motions to limit the testimony of Richard Rickelman and to preclude evidence of specific subject matters be, and it hereby is, granted insofar as it seeks to bar evidence respecting the current status of North American, and the amount of attorney fees expended by it, and denied without prejudice in all other respects dependent upon the nature of the proof offered at trial; and

5.   That defendant's motion to preclude the testimony of
     Gary Young be, and it hereby is, denied without
     prejudice dependent upon the nature of the proof
     offered at trial.

     The Clerk is directed to forward copies of this written
opinion and order to all counsel of record.

DATED:   January 15, 2010

John T. Copenhaver, Jr.
United States District Judge

26